Michael A. Caddell (SBN 249469)
mac@caddellchapman.com
Cynthia B. Chapman (SBN 164471)
cbc@caddellchapman.com
Amy E. Tabor (SBN 297660)
aet@caddellchapman.com
John B. Scofield, Jr. (pro hac vice forthcoming)
jbs@caddellchapman.com
CADDELL & CHAPMAN
628 East 9th Street
Houston TX 77007-1722
Tel.: (713) 751-0400
Fax: (713) 751-0906

*Attorneys for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA
## WESTERN DIVISION

| | |
|---|---|
| CHRIS KOBIN, *individually and on behalf of others similarly situated,*<br><br>　　　*Plaintiff,*<br><br>　　v.<br><br>BIG PICTURE LOANS, LLC, ASCENSION TECHNOLOGIES, LLC F/K/A BELLICOSE CAPITAL, LLC, MATT MARTORELLO,<br><br>　　　*Defendants.* | Case No. 2:19-2842<br><br>**CLASS ACTION COMPLAINT**<br><br>Date:<br>Time:<br>Ctrm:<br>Judge: |

COMES NOW, Plaintiff, Chris Korbin ("Plaintiff"), *on behalf of himself and all individuals similarly situated*, by counsel, and for his Class Action Complaint against Defendants, Big Picture Loans, LLC, Ascension Technologies, LLC f/k/a Bellicose Capital, LLC, and Matt Martorello (collectively "Defendants"), he alleges as follows:

## I.      INTRODUCTION

1.   This case involves the online payday lending industry[1], which takes advantage of desperate Americans needing quick access to money by charging unconscionably high interest rates, often exceeding 590%. The usury law in California, similar to statutes across the country, is designed to "protect against the oppression of debtors through excessive rates of interest charged by lenders."[2] Payday lenders, such as Big Picture Loans, LLC, claim that they are above the law because they are supposedly wholly-owned by a Native American tribe. However, lurking in the shadows, there is a complicated corporate management structure attempting to hide the fact that non-tribal members control the lending practices and reap the overwhelming majority of the profits. The purpose of this litigation is to shed light on this criminal enterprise that was established with the intent of evading state lending laws, to return the illegal gains to the exploited borrowers, to obtain statutory damages in accordance with California and federal law, and to enjoin the Defendants from collecting on their illegal loans or otherwise continuing their illegal practices.

2.   Attempting to insulate themselves from legal liability for their usurious lending practices, Defendants established what is commonly referred to as a "rent-

---

[1] The term "payday loan" is generally recognized as a loan of short duration, typically two weeks coinciding with the borrower's next payday, at a high rate of interest. Similarly, an installment loan is a small-dollar consumer loan with terms that allow for the repayment of the debt over a period of months, generally with bi-weekly or monthly payment terms. Plaintiff may refer to the loans and lending practices at issue in this litigation as "payday loans" or "payday lending," even though the loans to Plaintiff and members of the Class may be more accurately defined as installment loans. Regardless of whether the term "payday loan" or "installment loan" is used hereafter, the lending practices at issue pertain to unlicensed loans of less than $5,000 made to California borrowers at interest rates that exceed an annual percentage rate ("APR") of 12 percent. CAL. CONST., Art. XV, § 1 (limiting the legal rate of interest to 10%); CAL. CIV. CODE §§ 1916–1, 1916–2 (limiting the maximum legal rate of interest by contract to 12%).

[2] *Sheehy v. Franchise Tax Bd.*, 84 Cal.App.4th 280, 283, 100 Cal. Rptr. 2d 760 (2000).

a-tribe" business model,[3] where a lender associates with a Native American tribe in an attempt to cloak itself in the privileges and immunities enjoyed by the tribe—or to create the illusion that it enjoys tribal immunity.

3.   In this instance, Defendant Matt Martorello used the Lac Vieux Desert Band of Lake Superior Chippewa Indians (the "Tribe") to set up a lending entity supposedly beyond the reach of state and federal licensing and lending laws. Under the rent-a-tribe model, Defendants made high-interest loans in the name of Big Picture Loans, LLC ("Big Picture Loans"), which claims to be owned and operated by the Tribe. In reality, Martorello's company, Bellicose Capital, LLC ("Bellicose Capital"), controlled the underwriting, funded the loans, provided customer service, and handled the day-to-day operations of the business.

4.   Big Picture Loans served as a front to disguise Martorello's and his company's roles and to ostensibly shield the scheme by exploiting tribal sovereign immunity. In return for the use of its name to exploit claims of tribal sovereign immunity, the Tribe received about two percent (2%) of the revenue from the loans.[4]

5.   In approximately January 2016, Ascension Technologies, LLC ("Ascension Technologies") acquired Bellicose Capital. Like Big Picture Loans, Ascension Technologies claims to be owned and operated by the Tribe.[5] Despite the

---

[3] The term "rent-a-tribe" has been repeatedly used in federal indictments, actions by attorneys general, and private litigants to describe the subject "scheme" or business model. *See, e.g., Commonwealth of Pa. v. Think Finance, Inc.*, Case No. 14-cv-7139, 2016 WL 183289 *1, 11 (E.D. Pa. Jan. 14, 2016) (denying motion to dismiss claims that loan servicer's and its related entities' lending scheme violated state and federal laws).

[4] Zeke Faux, Payday Lenders are Changing the Game Ahead of a U.S. Crackdown, Bloomberg (Feb. 4, 2016) ("Bellicose has collected tens of millions of dollars, with the tribe keeping about 2 percent of the revenue…."). https://bloomberg.com/news/articles/2016-02-04/payday-lenders-are-changing-the-game-ahead-of-a-u-s-crackdown (last visited April 1, 2019).

[5] This lawsuit challenges Big Picture Loans' and Ascension Technologies' anticipated claim that they are an "arm of the Tribe" and thus entitled to the protection of sovereign immunity.

Although the doctrine of tribal sovereign immunity may protect the Tribe itself, such tribal sovereignty does not automatically extend to economic subdivisions of a tribe; the

alleged tribal ownership, Ascension Technologies continues to conduct its business off of the tribal reservation and generate massive profits for Martorello. In fact, Ascension Technologies does not employ a single tribal member as an employee and conducts a significant amount of its illegal operations at its corporate offices in Atlanta, Georgia. On information and belief, at all times relevant to this litigation, the Tribe has had <u>no direct control</u> over the income, expenses, or day-to-day operations of Big Picture Loans, Bellicose Capital, or Ascension Technologies. Further, on information and belief, the Tribe does not fund the loans or handle the servicing or collection of the loans.

6.    From his residence in Los Angeles County, California, Plaintiff, Chris Kobin, received a short-term installment loan in April 2018. Through online application and confirmation by telephone, Mr. Kobin obtained a $500 loan from Big Picture Loans with monthly payments of $280.24. The Big Picture Loans representative did not tell Mr. Kobin that the interest rate for his loan would exceed 590%. He was not given the opportunity to consider Big Picture Loans' agreement and was not informed that it would attempt to set aside his rights under California

---

Court must determine whether these entities are "analogous to a governmental agency, which should benefit from sovereign immunity" or whether they are more like a "commercial business enterprise, instituted for the purpose of generating profits for [their] private owners." *Breakthrough Mgmt. Grp., Inc. v. Chukchansi Gold Casino & Resort*, 629 F.3d 1173, 1184 (10th Cir. 2010) (citation omitted). Whether an entity is entitled to sovereign immunity as an "arm of the Tribe" turns on several factors, including (1) the method of creation of the entity, (2) its purpose, (3) its structure, ownership, and management, including the amount of control the tribe has over the entity, (4) the tribe's intent with respect to the sharing of its sovereign immunity, and (5) the financial relationship between the tribe and the entity. *U.S., ex rel. Cain v. Salish Kootenai College, Inc.*, 862 F.3d 939, 944 (9th Cir. 2017) (internal quotations and citations omitted).

In addition to the analysis in this Complaint concerning the creation, purpose, and business structure of Big Picture Loans and Ascension Technologies, these companies are not entitled to sovereign immunity because the conduct at issue occurred outside of the reservation boundaries; the vast majority of the profits from the scheme went to non-tribal participants; the companies are not wholly owned, operated, and/or controlled by the Tribe; and the companies were established for the sole purpose of evading state usury laws. Further, extending the protections of tribal immunity to Defendants' scheme would not serve the policies underlying tribal sovereign immunity.

law. Over approximately six months, Mr. Kobin paid a total of $1,665.03 as principal and interest on the $500 loan.

7.  Plaintiff asserts a class claim for Defendants' violations of California's lending statutes. Under California law, unlicensed lenders may not contract to charge interest rates that exceed an annual percentage rate ("APR") of 12 percent. CAL. CONST., Art. XV, § 1 (limiting the legal rate of interest to 10%); CAL. CIV. CODE §§ 1916–1, 1916–2 (limiting the maximum legal rate of interest by contract to 12%). Under California law, a lender must be licensed to make a loan of less than $5,000, unless the annual interest rate does not exceed 12 percent.

8.  Defendants' conduct, as alleged herein, violated the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–1968. Defendants acted in concert and conspired with others to repeatedly violate state lending statutes resulting in the collection of an unlawful debt from Plaintiff and the Class members. In violation of the state usury laws, Defendants sought to collect, and did collect on usurious, "unlawful debts" under 18 U.S.C. § 1961(6), specifically Defendants collected debts incurred in "the business of lending money" where the "usurious rate is at least twice the enforceable rate" under state or federal law. Defendants' acts described herein are unlawful as set forth in 18 U.S.C. § 1962. Plaintiff asserts these claims for violation of RICO on behalf of a Class of all Defendants' borrowers nationwide and also on behalf of a Subclass of California borrowers.

9.  In the alternative, Plaintiff also asserts a class claim for Defendants' unjust enrichment. Defendants were unjustly enriched by their receipt of any payments on the void and uncollectable loans. It would be inequitable for the Defendants to accept or retain the benefit conferred by their unlicensed and usurious lending scheme, namely the collection on illegal loans. Plaintiff asserts these claims for unjust enrichment on behalf of a Class of all Defendants' borrowers nationwide and also on behalf of a Subclass of California borrowers.

10. In a judgment entered against the Defendants jointly and severally, the Court should order that the debts at issue are void and that Defendants must repay the principal and interest to Mr. Kobin, the Classes, and the Subclasses arising out of Defendants' loan transactions. Plaintiff further seeks injunctive and/or declaratory relief in the form of debt forgiveness on all pending and future loans, as well as other injunctive relief addressed in detail below. Plaintiff also requests the collection of statutory damages, reasonable attorneys' fees, and costs to the extent permissible under state and federal law. *See, e.g.*, Cal. Civ. Code § 1717.

11. Plaintiff also seeks a declaratory judgment that the choice-of-law, forum selection, tribal dispute resolution, and class action waiver provisions in Big Picture Loans' loan agreement are void and unenforceable because they violate California law. *See, e.g.*, Cal. Fin. Code § 22324 ("Any person who contracts for or negotiates in this state a loan to be made outside the state for the purpose of evading or avoiding the provisions of this division is subject to the provisions of this division."). Additionally, the terms of the loan agreement are void and unenforceable because they are unconscionable and against public policy. Cal. Fin. Code § 22001 (The purpose of the statute is "[t]o protect borrowers against unfair practices by some lenders, having due regard for the interests of legitimate and scrupulous lenders."). *See also, Brack v. Omni Loan Co., Ltd.*, 80 Cal. Rptr.3d 275, 285–86,164 Cal. App. 4th 1312, 1327 (2008) (holding that California has a fundamental policy interest in applying the terms of the Consumer Financing Law, not the less restrictive laws of another jurisdiction). For example, the loan agreement seeks to disclaim all federal and state laws in favor of "tribal law," which does not provide the rights or remedies to protect consumers. The choice of law, dispute resolution, and class action waiver provisions offer no forum for a just and fair adjudication of Plaintiff's rights and

obligations. These unconscionable provisions also render the loan agreements void and unenforceable as a matter of public policy.[6]

## II. JURISDICTION AND VENUE

12. This Court has jurisdiction pursuant to 18 U.S.C. § 1965 and 28 U.S.C. § 1332(d)(2). Moreover, the Court has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.

13. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) as Plaintiff, Chris Kobin, is a resident of this District and a substantial part of Plaintiff's claims and damages occurred in this Division of the Central District of California.

## III. PARTIES

14. Plaintiff Chris Kobin is a natural person and resident of Burbank, Los Angeles County, California.

15. Defendant Big Picture Loans is a limited liability company doing business as an internet lending website under the domain name www.bigpictureloans.com. Big Picture Loans is the successor in interest of Red Rock Tribal Lending, LLC ("Red Rock") and Castle Payday (collectively referred to hereafter as "Big Picture Loans").[7] Big Picture Loans does business in Los Angeles County, and throughout the State of California and the United States.

16. Defendant Matt Martorello is a natural person and resident of Dallas, Texas and/or Dorado, Puerto Rico. Martorello was the founder and chief executive officer of Bellicose Capital, which Martorello created to make and collect the

---

[6] For example, in two recent cases, the Fourth Circuit held that similar provisions were unenforceable for violating public policy. *Hayes v. Delbert Services Corp.*, 811 F.3d 666, 673 (4th Cir. 2016) ("This arbitration agreement fails for the fundamental reason that it purports to renounce wholesale the application of any federal law to plaintiffs' federal claims."); *see also Dillon v. BMO Harris Bank, N.A.*, 2017 WL 1903475, at *4 (4th Cir. 2017) ("[W]e interpret these terms in the arbitration agreement as an unambiguous attempt to apply tribal law *to the exclusion of federal and state law*.").

[7] Castle Payday, We Have Big News! Castle Payday is now Big Picture Loans, https://www.bigpictureloans.com/CastlePaydayRedirectLanding (last visited April 11, 2019).

CASE NO. 2:19-2842     – 6 –

usurious loans described herein. Martorello was the architect of the rent-a-tribe lending scheme and had direct personal involvement in the creation and day-to-day operations of the illegal enterprise. Martorello does business in Los Angeles County, and throughout the State of California and the United States.

17. Defendant Ascension Technologies, LLC, f/k/a Bellicose Capital, LLC ("Ascension Technologies") is a limited liability company. Bellicose Capital was formed in approximately 2011 under the laws of the U.S. Virgin Islands and then Puerto Rico. Based on available evidence, Ascension Technologies' principal place of business is in Atlanta, Georgia. On information and belief, Bellicose Capital procured the investment capital, targeted desperate borrowers, serviced the loans, and received the vast majority of the revenue from loans created through Big Picture Loans. In approximately 2016, Martorello transferred, sold, or merged Bellicose Capital into Ascension Technologies, a subsidiary of Tribal Economic Development Holdings, LLC, in an attempt to shield Bellicose Capital's illegal business practices. Although the nominal ownership of the company changed, Ascension Technologies continues to funnel a significant amount of its income to Martorello and/or other non-tribal members.[8] Further, Ascension Technologies operates independent of the Tribe with most of its business services and operations based in Atlanta, Georgia, the Philippines, and Puerto Rico. On information and belief, Ascension Technologies does not employ a single member of the Tribe, and none of the business operations of the company occur on tribal land. Ascension Technologies does business in Los Angeles County, and throughout the State of California and the United States.

---

[8] Zeke Faux, *Payday Lenders on the Run*, Bloomberg Business Week (Feb. 8, 2016) ("Martorello is selling Bellicose to the tribe for just $1.3 million upfront, plus as much as $300 million in future payments, depending on how the business does.").

## IV.  FACTUAL ALLEGATIONS

18. Plaintiff, Chris Kobin, applied for a short-term installment loan from Big Picture Loans in April 2018, while at his residence in Los Angeles County, California.

19. Shortly after completing his online application, a Big Picture Loans representative called Mr. Kobin, informed him that he was eligible for a $500 loan, and noted that he would be making payments of $280.24 every month.

20. The Big Picture Loans representative did not explain that the annual percentage rate for his loan would be 590% or that the anticipated finance charges for his loan would be a total of $1,181.49 (in addition to the repayment of the principal of $500).

21. During the same call, the Big Picture Loans representative sent Mr. Kobin an email with an internet link that would enable him to complete the loan application process. The Big Picture Loans representative made sure that Mr. Kobin digitally signed the loan document and returned/submitted it before he got off the phone.

22. The Big Picture Loans representative did not explain the terms of the loan agreement and knew that Mr. Kobin could not have read the six-page document during their short call.

23. Mr. Kobin was not aware that, according to the terms of his loan, he was purportedly waiving his rights as a California consumer under the loan.

24. On or about April 17, 2018, Mr. Kobin received a deposit of $500 into his account from Big Picture Loans or its affiliated company.

25. From May through October 2018, Mr. Kobin made a total of **$1,665.03** in payments to Big Picture Loans on the **$500** loan.

26. If the April 2018 loan had been at an APR of 12%, Mr. Kobin would have paid approximately $530 in principal and interest.

## V.  CLASS ALLEGATIONS

**A. California Licensing Requirements, Usury Statutes, and Equitable Considerations Protect California Residents from Defendants' Predatory Lending Practices**

27. The State of California has taken aggressive measures to protect its residents from predatory lending practices.

28. Under California law, a lender is generally prohibiting from contracting for a loan that exceeds 12 percent interest. CAL. CIV. CODE §§ 1916–1, 1916–2.

29. If a lender willfully makes a loan that charges more than 12% interest, the lender is guilty of "loan-sharking," a felony offense. CAL. CIV. CODE § 1916–3.

30. "When a loan is usurious, the creditor is entitled to repayment of the principal sum only. He is entitled to no interest whatsoever. The attempt to exact the usurious rate of interest renders the interest provisions of a note void." *Hardwick v. Wilcox*, 11 Cal. App. 5th 975, 979, 217 Cal.Rptr.3d 883, 886 (2017) (citations omitted).

31. California also enacted the California Financing Law (formerly known as the Finance Lenders Law) as a comprehensive statutory structure to regulate consumer loans in the state. The law is to be "liberally construed and applied to promote its underlying purposes and policies," which include protection against "unfair practices" by lenders and promotion of "fair" lending practices. CAL. FIN. CODE § 22001.

32. The California Financing Law allows for lenders to charge higher interest rates for loans if certain prerequisites are met, namely obtaining a lending license. Under section 22100(a), "no person shall engage in the business of a finance lender or broker without obtaining a license from the commissioner"; a "finance lender" is "any person who is engaged in the business of making consumer loans." CAL. FIN. CODE §§ 22009; 22100.

33. Where an unlicensed lender willfully violates the licensing requirements of the California Financing Law, any loan made by an unlicensed lender is <u>void</u>, and the lender has no right to "collect or receive any principal, charges, or recompense in connection with the transaction." CAL. FIN. CODE § 22750(b).

34. Even if the Defendants were licensed in California to make consumer loans, the maximum rate of interest that could be charged under the California Financing Law would be less than 40%. CAL. FIN. CODE §§ 22303, 22304, 22370.

35. If any amount is willfully charged in excess of the rates permitted under the California Financing Law, "the contract of loan is <u>void</u>, and no person has any right to collect or receive any principal, charges, or recompense in connection with the transaction." CAL. FIN. CODE § 22750(a) (emphasis added).

36. Additionally, California law provides that if this Court finds as a matter of law that the loan agreement or any clause of the agreement was unconscionable at the time it was made, the Court "may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result." CAL. CIV. CODE § 1670.5(a). A violation of this provision is subject to the remedies specified in the California Financing Law. CAL. FIN. CODE § 22302.

37. Additionally, any lender who negotiates in or contracts for a loan in California that supposedly will be made outside of the state for purposes of evading California law is subject to the provisions of the California Financing Law. CAL. FIN. CODE § 22324 ("Any person who contracts for or negotiates in this state a loan to be made outside the state for the purpose of evading or avoiding the provisions of this division is subject to the provisions of this division."). Additionally, "the requirements of the Finance Lenders Law [now known as the California Financing Law] are matters of fundamental public policy which cannot be waived by way of

agreement between the parties." *Brack*, 164 Cal. App. 4th at 1326, 80 Cal.Rptr.3d at 284.

**B. Overview of Defendants' Enterprise**

38. Over the last decade, businesses have sought to evade state lending laws by entering into ventures with Native American tribes "so they can use tribal immunity as a shield for conduct of questionable legality." *Michigan v. Bay Mills Indian Cmty.*, 134 S. Ct. 2024, 2052 (2014) (Scalia, J., dissenting) (citing Nathalie Martin & Joshua Schwartz, *The Alliance Between Payday Lenders and Tribes: Are Both Tribal Sovereignty and Consumer Protection at Risk?* 69 Wash. & Lee L. Rev. 751, 758-759, 777 (2012)).

39. Defendant Martorello recognized the exorbitant profits he could achieve by not complying with state usury laws and making high interest loans to desperate and vulnerable consumers, many of whom are California residents.

40. Through Bellicose Capital, Martorello established a rent-a-tribe business model with the Tribe. They assisted the Tribe in forming Big Picture Loans (then known as Red Rock) as a "business enterprise" of the Tribe, which then claimed to be "wholly owned" and "operated as an instrumentality of the Tribe."[9]

41. According to tribal records, "all information and records of Big Picture are confidential," so the agreements and business operations among Defendants have not yet been fully disclosed. Court filings that have included some of the Defendants' business agreements have been altered to redact information relevant to the business dealings.

42. Upon information and belief, the Tribe has had no direct control over the income or expenses of Big Picture Loans.

---

[9] *See, e.g.*, Lac Vieux Desert Band of Lake Superior Chippewa Indians, Resolution # T2014-066, Approving the Creation of the Wholly Owned and Operated Lending Entity—Big Picture Loans, LLC (Aug. 26, 2014), http://www.lvdtribal.com/pdf/BPL%20Organizing%20Documents.pdf (last viewed April 1, 2019).

43. Although the Tribe holds itself out as the actual lender of the internet payday loans, the Tribe is merely a front. The Tribe allowed Defendants to use its name and, in return, received a nominal percentage of the revenue.[10] Bellicose Capital provided the infrastructure and investment capital to market, fund, underwrite, and collect the loans, including by providing the following services: lead generation, technology platforms, payment processing, and collection procedures.

44. Moreover, nearly all activities performed on behalf of Big Picture Loans were performed by officers and employees of Bellicose Capital, now Ascension Technologies, who were not located on the Lac Vieux Reservation. On information and belief, Bellicose Capital employees were located in Atlanta, Georgia, the Virgin Islands, Puerto Rico, and the Philippines. When Ascension Technologies stepped into the enterprise, it continued to run the operations off of the tribal lands with no employees of the Tribe.

45. On information and belief, Bellicose Capital handled the lead generation used to identify and solicit potential consumers.[11] Bellicose Capital's lead generation procedures were developed by Martorello.

46. On information and belief, if a consumer called the number on Big Picture's marketing materials and promotional solicitations, he or she would reach

---

[10] Zeke Faux, *Payday Lenders on the Run*, Bloomberg Business Week (Feb. 8, 2016) ("[Matt Martorello's] company, Bellicose Capital, helps an American Indian tribe in Michigan run websites that offer small loans to the public at annualized interest rates as high as 780 percent. Bellicose has collected tens of millions of dollars, with the tribe keeping about 2 percent of the revenue….").

[11] In order to find potential customers, internet lenders pay companies known as "lead generators," which are businesses that collect information on potential consumers to solicit for high-interest loans. *Pew Charitable Trust, Fraud and Abuse Online: Harmful Practices in Internet Payday Lending* (Oct. 2014), http://www.pewtrusts.org/-/media/assets/2014/10/payday-lending-report/fraud_and_abuse_online_harmful_practices_in_internet_payday_lending.pdf (last visited April 1, 2019). Lead generators pay high fees to several sources, such as consumer reporting agencies, to acquire borrower information to determine whether a consumer has ever applied or received an internet loan or whether a consumer may be in need or qualify for an additional loan. *Id.*

Ascension Technologies' call center in the Philippines, which was monitored by employees in the Virgin Islands and Puerto Rico, all of whom took direction and instructions from Bellicose Capital and not the Tribe.

47. In 2016, due to various lawsuits against Martorello's competitors and anticipated regulation from the Consumer Financial Protection Bureau ("CFPB"), Martorello transferred or sold Bellicose Capital in an attempt to shield Bellicose Capital's illegal business practices. Bellicose was re-branded as Ascension Technologies, which continues to operate with minimal tribal involvement or benefit to the Tribe. Though nominally a company owned by the Tribe, Ascension Technologies generates no income for the Tribe.

48. As part of the transition of Bellicose Capital's business enterprise to Ascension Technologies, the Tribe paid Martorello $1.3 million dollars, plus he is entitled to receive as much as *$300 million* in future payments.[12] Through several corporate shells, Martorello is receiving variable, non-regular payments that may total $300 million over the course of seven years, based on the performance of Big Picture Loans. In other words, though he technically does not own either Big Picture or Ascension Technologies, Martorello receives a significant majority of every net dollar earned by Big Picture Loans (and as previously noted, Ascension Technologies does not generate any income for the Tribe). According to a press release by the Tribe, each of the annual payments to Martorello's company will "build additional equity in its own lending support business."[13] Thus, the Tribe acknowledges that it does not own all of the equity in the company. With the purchase structured so that Martorello's company continues to receive the majority

---

[12] Faux, *supra* notes 4, 8, 10.

[13] https://www.prnewswire.com/news-releases/lac-vieux-desert-band-of-lake-superior-chippewa-indians-bolsters-tribal-economic-development-portfolio-with-purchase-of-bellicose-capital-llc-300210679.html (last visited April 1, 2019).

CLASS ACTION COMPLAINT

of the profits earned by Big Picture Loans, the Tribe continues to receive only a modest fee in return for the use of its name.

49. And while it is now purportedly organized under the laws of the Tribe, Ascension Technologies continues to operate in the same manner and with several of the same individuals who ran Bellicose Capital-none of whom appear to be affiliated with the Tribe.

50. Upon information and belief, tribal members do not participate in the day-to-day operations of Ascension Technologies and have only a minimal role in Big Picture Loans, and nearly all the activities associated with these companies occurred off the Tribe's reservation, such as the office management, business development, internet marketing, call centers, payment processing, and servicing of the loans.

51. For example, approximately 14 individuals identify Ascension Technologies as their employer on LinkedIn; however, none of these people are located on the reservation. https://www.linkedin.com/company/ascension-technologies-llc/people/ (last visited April 1, 2019 ).

52. The Facebook page for Ascension Technologies lists Atlanta, Georgia as its place of business.



https://www.facebook.com/pages/Ascension-Technologies-LLC/1151747724868477 (last visited April 1, 2019).

53. According to its employees' LinkedIn pages, Ascension Technologies conducts its risk analysis, database administration, database development, analytics,

database marketing, strategic marketing, digital marketing, and data analysis in Atlanta, Georgia. At least two corporate vice presidents work in Atlanta. https://www.linkedin.com/search/results/people/?facetCurrentCompany=%5B%2212899424%22%5D (last visited April 1, 2019).



− 15 −

54. In Puerto Rico, where Martorello claims a residence, Ascension Technologies has additional business operations.[14] According to the LinkedIn pages of its employees, corporate office management for Ascension Technologies occurs from Puerto Rico. Additionally, the company's predictive modeling, data science, and compliance testing are conducted in Puerto Rico.

55. Ascension Technologies' director of business development is located in Chattanooga, Tennessee, and on his LinkedIn page, he describes the company's business as follows:



**Director of Business Development**
Ascension Technologies, LLC
Aug 2016 – Present • 1 yr 11 mos

Ascension Technologies, LLC is a wholly owned subsidiary of Tribal Economic Development Holdings, LLC, a wholly owned and operated economic arm and instrumentality of the Lac Vieux Desert Band of Lake Superior Chippewa Indians, a federally recognized Indian tribe.

The team at Ascension Technologies, LLC has an extensive history in servicing lending portfolios, helping hundreds of thousands of people to achieve their financial goals. They specialize in facilitating personal, unsecured loans and financing, as well as the building of risk models, marketing, and providing customer service. Ascension does this by using cutting-edge technology, big data, and creative innovation to provide a transparent, frictionless, and highly efficient marketplace for the everyday borrower. Ascension effectively automates all aspects of operations while ensuring the ability to scale the lending portfolio, including the borrower application process, regulatory compliance, credit decisions, and underwriting. Combining strategic, technical, operational and organizational expertise with proven disciplined approaches, Ascension builds solutions that get results

https://www.linkedin.com/in/ben-u-63532012/ (last visited April 1, 2019).

56. Ascension Technologies' vice president of marketing in Atlanta describes her position as follows:

---

[14]                https://www.linkedin.com/search/results/people/?facetCurrentCompany=%5B%2212899424%22%5D&keywords=ascension%20technologies%20puerto%20rico&origin=GLOBAL_SEARCH_HEADER         (last       visited       April       1,       2019); https://www.linkedin.com/search/results/people/?facetCurrentCompany=%5B%2212899424%22%5D&keywords=ascension%20technologies%20manager&origin=GLOBAL_SEARCH_HEADER (last visited April 1, 2019).



**Vice President Marketing**
Ascension Technologies, LLC
Nov 2016 – Present  •  1 yr 8 mos
Atlanta, Georgia

Create and lead data-driven omni-channel marketing strategies and tactics for customer acquisition and retention in B2C sub-prime lending. Drive strategy, brand, digital, traditional and emerging channels to deliver marketing success. Use data and sophisticated analytics to accelerate revenue growth.

57. Ascension Technologies' director of digital marketing in Atlanta describes his position at the company as follows:



**Director of Digital Marketing**
Ascension Technologies, LLC
Jan 2017 – Present  •  1 yr 6 mos
Greater Atlanta Area

Vertical – B2C Online Personal Lending – Big Picture Loans – www.bigpictureloans.com

Responsible for all digital marketing & advertising for Big Picture Loans including; mixed-media channel budget planning & multi-channel integration, partner directly with Direct Mail channel owner, ensuring all creative assets and messaging unify both the digital and offline customer journey

Directly hands-on, build & manage all digital marketing campaigns and strategies including; SEO, SEM, Social, Programmatic, Content Marketing & Amplification, email Marketing, Campaign Landing Page Development, Re-targeting and Marketing Automation

Directly manage all Paid Search accounts and Programmatic Display strategy leads through testing, campaign optimizations and budget allocations

Develop and manage all CRM touch points including; direct marketing, email marketing (customer lists exceeding 2MM), retention strategies, and new customer acquisition initiatives via Hubspot

Lead and spearhead the redesigned of Big Picture Loans Website, hands-on built landing pages, designed and sourced digital assets, photo selections and architected all UX/Conversion Optimization strategy

Establish and manage all Social Media channel presence, including identifying and targeting audience segmentation, reporting, budget recommendations and content publishing

Create, manage, source and publish all digital content in a variety of shareable and downloadable formats

Build, manage and report on all cross-channel digital marketing efforts through various campaign strategies and performance metrics

https://www.linkedin.com/in/mike-richardson-9048204/ (last visited April 1, 2019).

58. None of Ascension Technologies' employees, referenced above, are members of the Tribe.

59. None of Ascension Technologies' day-to-day business operations occur on the Tribe's reservation.

## C. Defendants' Lending Practices Violated California's Constitution and Usury Statutes

60. At all times relevant to Big Picture Loans' purported loans to Mr. Kobin and the Classes, California law prohibited the charging of usurious rates of interest.

61. California law has prohibited unlicensed lenders from making loans for less than $5,000 at interest rates exceeding 12 percent. CAL. FIN. CODE §§ 1916–1, 1916–2.

62. Through advertising, marketing, and telephonic communications targeted California consumers for their lending practices, including the loans to Mr. Kobin.

63. Under the terms of the standard loan agreement, the interest rates charged by Defendants were significantly greater than the maximum legal rate that can be charged under California law.

64. For example, Defendants marketed and made a $500 loan to Chris Kobin with interest at an APR of 590%.

65. Accordingly, Plaintiff and the applicable Class are entitled to recover treble the amount of money that was paid in excess of 12% interest. CAL. FIN. CODE § 1916–3. Under this statute, for example, Mr. Kobin is entitled to recover approximately $3,405.09, which is treble his excessive interest payment of approximately $1,135.03.

## D. Defendants' Lending Practices Violated the California Financing Law

66. At all times relevant to Big Picture Loans' purported loans to Mr. Kobin and the Class, any loan made to California borrowers without the requisite license is void, and the lender has no right to collect, receive or retain any principal or interest. CAL. FIN. CODE § 22750.

67. Defendants have never applied to the California Commissioner for a license permitting them to make loans to California borrowers.

68. Defendants have never had a consumer finance license permitting them to make loans to California borrowers.

69. Defendants chose California as a place where loans and collection efforts would ensue and participated in and knew of the actions of the other Defendants in California.

70. Martorello knew the subject loans were illegal under California law, but pursued the scheme anyway through Big Picture Loans and Ascension Technologies.

71. Through advertising and marketing, Defendants targeted California consumers for their lending practices, including the loans to Mr. Kobin.

72. Defendants negotiated and contracted for loans with California residents and now attempt to claim that said loans were made outside the state for the purpose of evading or avoiding the provisions of the California Financing Law.

73. "Any person who contracts for or negotiates in this state a loan to be made outside the state for the purpose of evading or avoiding the provisions of this division is subject to the provisions of this division." CAL. FIN. CODE § 22324.

74. Accordingly, Defendants' loans to California residents are null and void, and it was unlawful for Defendants or any of their affiliated entities to collect or receive any principal or interest on the loans, including the amounts paid by Plaintiff.

**E. Defendants' Loan Agreements, Including Choice-of-Law, Dispute Resolution, and Class Action Waiver Provisions, Are Void and/or Unenforceable**

75. Because the loans were made and collected without a consumer finance license and charged an interest rate in excess of the maximum rate permitted under

California law, the agreements are void and unenforceable, and/or Plaintiff and the Class are entitled to recover treble damages for the excessive interest paid.

76. Defendants' loan agreement not only violates California's consumer lending statutes and the public policy against usurious loans, but it also contains unconscionable and unenforceable choice of law and forum selection provisions that seek to disclaim laws and legal rights and ultimately deprive consumers of their day in court.

77. For example, Defendants' Loan Agreement with Plaintiff provides:

> **GOVERNING LAW AND FORUM SELECTION**: This Agreement will be governed by the laws of the Lac Vieux Desert Band of Lake Superior Chippewa Indians ("Tribal law"), including but not limited to the Code as well as applicable federal law. All disputes shall be solely and exclusively resolved pursuant to the Tribal Dispute Resolution Procedure set forth in Section 9 of the Code and summarized below for Your convenience.
>
> **SOVEREIGN IMMUNITY**: This Agreement and all related documents are being submitted by You to Big Picture Loans, LLC at its office on Tribal land. The Lender is an economic development arm, instrumentality, and limited liability company wholly owned and operated by the Tribe. The Tribe is a federally recognized Indian Tribe and is generally immune from suit as a sovereign nation unless such immunity is waived by the Tribe in accordance with Tribal law or abrogated by applicable federal law ("tribal sovereign immunity"). Because the Tribe and Lender are entitled to tribal sovereign immunity, You will be limited in what claims, if any, You may be able to assert against both the Tribe and Us. To encourage resolution of consumer complaints as well as provide an authorized method of dispute resolution for consumers, pursuant to Section 9 of the Code, all complaints lodged, filed, or otherwise submitted by You or on Your behalf must follow the Tribal Dispute Resolution Procedure, as described herein.

**PRESERVATION OF SOVEREIGN IMMUNITY**: It is the express intention of the Tribe and Lender, operating as an economic arm-of-the-tribe, to fully preserve, and not waive either in whole or in part, exclusive jurisdiction, sovereign immunity, and any other rights, titles, privileges, and immunities, to which they are entitled including the tribal sovereign immunity of the Tribe and Lender. To protect and preserve the rights of the parties, no person may assume a waiver of immunity exists except by express written resolution of the Tribe's Tribal Council specifically authorizing such a waiver as required by Article XIII of the Tribe's Constitution specifically for the matter in question.

**TRIBAL DISPUTE RESOLUTION PROCEDURE**: The Tribe has established a Tribal Dispute Resolution Procedure (the "Procedure") to review and consider any and all types of complaints made by you or on your behalf relating to or arising from this Agreement. . . . The Tribe and Lender intend and require, to the extent permitted by Tribal law, that any complaint lodged, filed, or otherwise submitted by You or on Your behalf to follow the Procedure. Under the Procedure, if You in the course of Your otherwise lawful and proper use of Lender's business believe Yourself to be harmed by some aspect of the operation of any part of Lender's business, You must direct Your concerns or dispute to Lender in writing. Your complaint to the Lender shall be considered similar in nature to a petition for redress submitted to a sovereign government, without waiver of tribal sovereign immunity and exclusive jurisdiction, and does not create any binding procedural or substantive rights for a petitioner. The Lender will investigate the complaint and respond as soon as reasonably practicable, but no later than thirty (30) days from the receipt of Your written complaint. In the event that You are dissatisfied with the Lender's determination, You may initiate Formal Dispute Resolution by requesting an administrative review of Lender's determination by submitting such request in writing to the Tribal Financial Services Regulatory Authority ("Authority"), P.O. Box 249, Watersmeet, MI 49969, no later than ninety (90) days

after receiving Lender's determination. The Authority may hold an administrative review hearing, if requested by You or Us, which will occur within sixty (60) days after the Authority receives Your written request. The Authority will send notice to You and Us when a request for a hearing is granted or denied. At any such hearing, You may be represented by legal counsel at Your own expense. You may appeal an Authority decision and order by filing a written petition for review with the Tribal Court within ninety (90) days after the Authority issued its decision and order.

(Kobin Loan Agreement, attached as Exh. 1, at 4–5.)

78. Upon information and belief, the governing law and forum selection clauses were template language included in all loan agreements involving Big Picture Loans.

79. Defendants' loan agreement contains unconscionable and unenforceable choice-of-law and forum selection provisions that seek to disclaim federal and state laws in favor of Tribal law.

80. Defendants' choice-of-law provision is unenforceable as a matter of federal law because it purports to disclaim all federal law.

81. Defendants' choice-of-law provision is unenforceable as a matter of California law because it purports to disclaim the application of any state law.

82. Likewise, the forum selection clause is also unenforceable because it deprives California borrowers of *any* forum to bring state or federal law claims.

83. The loan agreement disclaims that Plaintiff and the Class have any right to pursue either litigation or arbitration by a neutral third party. (Kobin Loan Agreement, attached as Exh. 1, at 5. ("NO LITIGATION OR ARBITRATION IS AVAILABLE") (emphasis in original).)

84. Instead, the Tribal Dispute Resolution Procedure only purports to allow consumers to follow a "Formal Dispute Resolution" with the Tribal Financial Services Regulatory Authority and the Tribal Court. (*Id.*)

85. The Tribal Dispute Resolution Procedure states that consumers do not have "any binding procedural or substantive rights" against Big Picture Loans. (*Id.*)

86. The Formal Dispute Resolution is a sham because the Tribal Financial Services Regulatory Authority does not have subject matter jurisdiction to consider: (1) any claims brought under state or federal law or (2) claims regarding the legality of the debt. Tribal Fin. Servs. Auth. Comm'n Regs., Reg. 1.1(B)(4), *available at* http://www.lvdtribal.com/pdf/TFSRA-Regulations.pdf (last visited April 1, 2019).

87. Specifically, the Regulations indicate that the Tribal Financial Services Regulatory Authority will not "grant the consumer an opportunity be heard" if the only allegation is that the loan "is illegal in a jurisdiction outside the jurisdiction of the Tribe." *Id.*, Reg. 1.1(B)(4)(b).

88. Further, the Regulations only provide that the Tribal Financial Services Regulatory Authority may "resolve the dispute in favor of the consumer upon a finding that the [tribal entity] *violated a law or regulation of the Tribe.*" Id., Reg. 1.1(B)(4)(c) (emphasis added).

89. In addition, even if the Regulations purported to grant the Tribal Financial Services Regulatory Authority jurisdiction to resolve such disputes, controlling Supreme Court precedent holds that tribal courts have no subject matter jurisdiction to adjudicate disputes regarding non-members of the tribe and off-reservation activities. *Plains Commerce Bank v. Tong Family Land & Cattle Co.*, 554 U.S. 316, 326 (2008).

90. Defendants' loan agreement even violates Tribal law, which requires that the following provisions must be conspicuous: "Governing Law and Forum Selection," "Sovereign Immunity," and "Preservation of Sovereign Immunity."

Specifically, under Tribal law, each of these paragraphs must be included "**in bold or all caps and conspicuously placed.**" TRIBAL CONS. FIN. SERVS. REG. CODE § 7.2(a); Tribal Fin. Servs. Auth. Comm'n Regs., Reg. 1.5(B) (emphasis added), *available at* http://www.lvdtribal.com/pdf/TFSRA-Regulations.pdf (last visited April 1, 2019). None of the provisions were conspicuous in the subject loan.

91. Defendants' governing law clause is unenforceable because it violates public policy concerns in California and was procured through fraud and misrepresentations, including that Big Picture Loans was "wholly owned and operated by the Tribe."

92. These statements were false, misleading, and designed to create the appearance that consumers were doing business with a neutral, government-like entity.

93. In reality, the loans were owned, serviced, and/or operated by non-tribal members, including the non-tribal persons employed by Ascension Technologies, who funded the loans, controlled the underwriting, and handled the day-to-day operations of the businesses, including the interactions with consumers and collections.

94. Through the Tribal regulatory code and class action waiver provision, Defendants also seek to deprive borrowers of any just and cost-effective means of seeking redress for Defendants' wrongful acts.

95. The Tribal regulatory code prohibits an award of attorneys' fees or costs to the borrower, if he were to prevail in the Tribe's formal dispute resolution procedure. TRIBAL CONS. FIN. SERVS. REGULATORY CODE § 9.3(i). Big Picture Loans, on the other hand, is permitted to recover attorneys' fees and reasonable costs for the collection of a debt. *Id.*, § 7.2(c). This is illegal under California law. CAL. CIV. CODE § 1717(a).

96. Similarly, the loan agreement seeks to strip Plaintiff of the opportunity to pursue his claims as a class action. (Kobin Loan Agreement, attached as Exh. 1, at 5 ("All disputes including any Representative Claims against Us and related third parties shall be resolved by the TRIBAL DISPUTE RESOLUTION PROCEDURE only on an individual basis with You as provided for pursuant to Tribal law.") (emphasis in original).)

97. The class action waiver clause violates Plaintiff's right to maintain a class action to redress unfair or deceptive acts or practices in accordance with California law.

98. In essence, Defendants use the forum selection and choice of law clauses to convert the terms of the loan agreement into "a choice of no law clause." *Hayes v. Delbert Servs. Corp.*, 811 F.3d 666, 675 (4th Cir. 2016).

**F. Class Definitions**

99. Plaintiff brings this action on his own behalf and as a class action pursuant to Federal Rule of Civil Procedure 23 for the following Classes and Subclass:

> **The Class**
> All persons: (1) who executed a loan with Big Picture Loans, (2) when they resided or were located in California, (3) where the loan was originated and/or any payment was made on or after April 12, 2015.

> **The California Usury Subclass**
> All persons: (1) who executed a loan with Big Picture Loans, (2) who paid more than the legal rate of interest in repayment of the loan, (3) when they resided or were located in California, (4) where the loan was originated and/or any payment was made on or after April 12, 2018.

> **The National RICO Class**
> All persons: (1) who executed a loan with Big Picture Loans, (2) when they resided or were located in the United States, (3) where the loan was originated and/or any payment was made on or after April 12, 2015.

**The California RICO Subclass**
All persons: (1) who executed a loan with Big Picture
Loans, (2) when they resided or were located in California,
(3) where the loan was originated and/or any payment was
made on or after April 12, 2015.

100.   **Numerosity**. FED. R. CIV. P. 23(a)(1). Upon information and belief, Plaintiff alleges that the Class and Subclass members are so numerous that joinder of all is impractical. The names and addresses of the Class and Subclass members are identifiable through the internal business records maintained by Defendants, and the Class and Subclass members may be notified of the pendency of this action by published and/or mailed notice.

101.   **Predominance of Common Questions of Law and Fact**. FED. R. CIV. P. 23(a)(2) & (b)(3). Common questions of law and fact exist as to all members of the Classes and Subclasses. These questions predominate over the questions affecting only individual Class members. These common questions include:

(a)      whether the choice-of-law, forum selection, dispute resolution, and/or class action waiver provisions in Defendants' loan agreement violate California law, offend public policy interests, and should be deemed unenforceable;

(b)     whether Defendants were licensed to make loans to California residents;

(c)     whether the failure to obtain the license renders the loans to Plaintiff and the class members void and/or unenforceable;

(d)     whether Defendants negotiated and contracted for loans with California residents and now attempt to claim that said loans were made outside the state for the purpose of evading or avoiding the provisions of the California Financing Law;

(e)     whether Defendants were authorized by California law to charge interest at an APR that exceeds 12%;

(f)     whether Defendants' attempt to charge interest in excess of 12% renders the interest provisions of the loan agreements void and uncollectible;

(g)     whether Plaintiff and the Usury Subclass are entitled to three times the maximum legal rate of interest that could be charged under California law;

(h)     whether the maximum legal rate of interest that could be charged was 12% interest as provided by California law;

(i)     whether Defendants' acts and/or practices in the conduct of commerce were unfair and/or deceptive;

(j)     whether Defendants participated in an enterprise under RICO;

(k)     whether the loans to California residents included interest rates at more than twice the legal maximum APR, in violation of California usury laws;

(l)     whether Plaintiff and the class members conferred a benefit on Defendants because of their payments of principal and interest on Defendants' void and uncollectible loans;

(m)     whether Defendants knew or should have known of the benefit conferred;

(n)     whether Defendants retained an unjust benefit because the loan was void;

(o)     whether Defendants violated the elements of 18 U.S.C. § 1962(c), as previously alleged;

(p)     whether Defendants entered into a series of agreements to violate § 1962(c);

(q) whether Defendants conspired or endeavored to collect on an unlawful debt through a pattern of racketeering activity; and

(r) what is the proper recovery for Plaintiff and the Class members against each Defendant.

102. **Typicality**. FED. R. CIV. P. 23(a)(3). Plaintiff's claims are typical of the claims of each Class and Subclass member. In addition, Plaintiff is entitled to relief under the same causes of action as the other members of the Classes and Subclasses. All are based on the same facts and legal theories.

103. **Adequacy of Representation**. FED. R. CIV. P. 23(a)(4). Plaintiff is an adequate representative of the Classes and Subclasses because his interests coincide with, and are not antagonistic to, the interests of the members of the Classes and Subclasses he seeks to represent; he has retained counsel competent and experienced in such litigation; and he has prosecuted and intends to continue to prosecute the action vigorously. Plaintiff and his counsel will fairly and adequately protect the interests of the members of the Class. Neither Plaintiff nor his counsel have any interests which might cause them not to vigorously pursue this action.

104. **Superiority**. FED. R. CIV. P. 23(b)(3). Questions of law and fact common to the Class and Subclass members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. Litigating the validity and enforceability of each loan agreement would prove burdensome and expensive. It would be virtually impossible for members of the Classes and Subclasses individually to effectively redress the wrongs done to them. Even if the members of the Classes and Subclasses themselves could afford such individual litigation, it would be an unnecessary burden on the courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system presented by the legal and

factual issues raised by Defendants' conduct. By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

105. **Injunctive Relief Appropriate for the Class**. FED. R. CIV. P. 23(b)(2). Class certification is also appropriate because Defendants have acted on grounds generally applicable to the Classes and Subclasses, making appropriate equitable, injunctive relief with respect to Plaintiff and the class members. Plaintiff, the Classes, and Subclasses seek an injunction prohibiting Defendants from collecting any further amounts from consumers in connection with their loans, requiring Defendants to provide notice to consumers that the loans are unenforceable, and requiring Defendants to delete any derogatory reporting on tradelines to the credit bureaus or other consumer reporting agencies, as well as ordering Defendants to divest themselves of any interest in any enterprise pled herein, including the receipt of racketeering profits; prohibiting Defendants from continuing to engage in any enterprise pled herein; and ordering the dissolution of each Defendant that has engaged in any enterprise pled herein.

## VI. CAUSES OF ACTION

### COUNT ONE – DECLARATORY JUDGMENT

106. Plaintiff incorporates each of the allegations in the preceding paragraphs as if restated here.

107. Defendants' loan agreement contains illegal and unconscionable choice of law, forum selection, class action waiver, and dispute resolution provisions that violate California law and are void and unenforceable for public policy concerns.

108. The dispute is a justiciable matter that is not speculative, and a resolution by this Court will determine the rights and interests of the parties to the Loan Agreement as well as the validity, if any, of the choice of law, forum selection, class action waiver, and dispute resolution provisions.

109. Pursuant to 28 U.S.C. § 2201, there is an actual justiciable controversy, and a declaratory judgment is the appropriate mechanism for resolving the validity and enforceability of the Loan Agreement.

110. Accordingly, Plaintiff, on behalf of himself and all others similarly situated, seeks a declaratory judgment that the choice of law, forum selection, class action waiver, and dispute resolution provisions are void and unenforceable as to California residents because such terms (a) violate California law, (b) are unenforceable because tribal authorities have no jurisdiction to adjudicate the relevant disputes, and (c) are unconscionable and contrary to matters of public policy.

## COUNT TWO – VIOLATIONS OF CALIFORNIA FINANCING LAW
### CAL. FIN. CODE §§ 22001, *et seq.*

111. Plaintiff incorporates each of the allegations in the preceding paragraphs as if restated here.

112. Defendants made loans to California consumers even though they are not licensed by the applicable authority to make loans in the State of California.

113. Defendants' unlicensed lending to California consumers was, and remains, a violation of California consumer protection laws.

114. Plaintiff and the Class Members seek a declaratory judgment that the loans are void and unenforceable as a matter of law. The dispute is a justiciable matter that is not speculative, and a resolution by this Court will determine the rights and interests of the parties to the loan agreement. Pursuant to 28 U.S.C. § 2201, there is an actual justiciable controversy, and a declaratory judgment is the appropriate mechanism for resolving the validity and enforceability of the Loan Agreement.

115. Because the loans at issue are void and unenforceable, Plaintiff and the Class request that the Court enter judgment against the Defendants jointly and severally for the recovery of all principal and interest paid to the Defendants under

the terms of the illegal loans. Plaintiff further seeks the recovery of attorneys' fees and costs as well as all other relief which may be due and owing under California law.

116.   Additionally, Plaintiff and the Class request that the Court permanently enjoin Defendants from the unlicensed practice of lending less than $5,000 to California borrowers, including but not limited to:

1. engaging in any business, in whatever form transacted, including but not limited to by mail, electronic means, the Internet, or telephonic means, that consists in whole or in part of making, offering, arranging, or acting as an agent in the making of loans of less than $5,000.00 at an interest rate that exceeds 12% APR in the State of California;

2. advertising, marketing, or soliciting in the State of California for a business that consists in whole or in part of making, offering, arranging, or acting as an agent in the making of loans of less than $5,000.00 at an interest rate that exceeds 12% APR through any media, including but not limited to the Internet, television, print, and radio;

3. collecting or attempting to collect payment of interest or principal pursuant to any loan agreement with any person in the State of California for a loan of less than $5,000.00 at an interest rate that exceeds 12% APR;

4. enforcing or attempting to enforce any loan agreement for a loan of less than $5,000.00 or less at an interest rate that exceeds 12% APR with any person in the State of California in any court or other tribunal, including but not limited to the Tribal authority of the Lac Vieux Desert Band of Lake Chippewa Indians; and

selling or assigning to any third party any agreement for a non-mortgage loan of less than $5,000.00 at an interest rate that exceeds 12% APR between any Defendant and any person residing in the State of California.

117.   Plaintiff further requests the Court enter an injunction prohibiting Defendants from collecting any further amounts from California consumers in connection with their loans of less than $5,000.00 at an interest rate that exceeds 12% APR, requiring Defendants to provide notice to consumers that the loans are unenforceable, and requiring Defendants to delete any derogatory reporting on tradelines to the credit bureaus or other consumer reporting agencies.

## COUNT THREE – VIOLATION OF CALIFORNIA USURY LAW
### CAL. FIN. CODE §§ 1916-1, *et seq*.

118.   Plaintiff incorporates each of the allegations in the preceding paragraphs as if restated here.

119.   In their loans to California consumers, Defendants charged and collected interest at a rate greater than the maximum legal rate of interest under California law.

120.   Plaintiff and the Class Members seek a declaratory judgment that interest payments at a rate in excess of the maximum allowable rate of interest are unenforceable as a matter of law. The dispute is a justiciable matter that is not speculative, and a resolution by this Court will determine the rights and interests of the parties to the loan agreement. Pursuant to 28 U.S.C. § 2201, there is an actual justiciable controversy, and a declaratory judgment is the appropriate mechanism for resolving the validity and enforceability of the Loan Agreement.

121.   Because the loans at issue are unenforceable, Plaintiff and the Class request that the Court enter judgment against the Defendants jointly and severally for the recovery of treble damages for all interest paid to the Defendants in excess of 12% APR under the terms of the illegal loans. Plaintiff further seeks the recovery of attorneys' fees and costs as well as all other relief which may be due and owing under California law.

122.   Additionally, Plaintiff and the Class request that the Court permanently enjoin Defendants from the practice of lending to California borrowers, including but not limited to:

1. engaging in any business, in whatever form transacted, including but not limited to by mail, electronic means, the Internet, or telephonic means, that consists in whole or in part of making, offering, arranging, or acting as an agent in the making of loans at an interest rate that exceeds 12% APR in the State of California;

2. advertising, marketing, or soliciting in the State of California for a business that consists in whole or in part of making, offering, arranging, or acting as an agent in the making of loans at an interest rate that exceeds 12% APR through any media, including but not limited to the Internet, television, print, and radio;

3. collecting or attempting to collect payment of interest at an interest rate that exceeds 12% APR pursuant to any loan agreement with any person in the State of California;

4. enforcing or attempting to enforce any loan agreement for a loan at an interest rate that exceeds 12% APR with any person in the State of California in any court or other tribunal, including but not limited to the Tribal authority of the Lac Vieux Desert Band of Lake Chippewa Indians; and

5. selling or assigning to any third party any agreement for a non-mortgage loan at an interest rate that exceeds 12% APR between any Defendant and any person residing in the State of California.

123.   Plaintiff further requests the Court enter an injunction prohibiting Defendants from collecting any further amounts from California consumers in excess of the principal of the loan and interest rate that does exceed 12% APR.

## COUNT FOUR – VIOLATIONS OF RICO, 18 U.S.C. § 1962(C)
### NATIONAL RICO CLASS

124.   Plaintiff incorporates each of the allegations in the preceding paragraphs as if restated here.

125.   At all relevant times, Big Picture Loans, LLC, Ascension Technologies, LLC f/k/a Bellicose Capital, LLC, and Matt Martorello were members and associates of an internet payday lending enterprise, whose members and associates engaged in the collection of unlawful debt.

126.   The Defendants, including their leadership, membership, and associates, constitute an "enterprise" as that term is defined in 18 U.S.C. § 1961(4) - that is, a group of individuals and entities associated in fact.

127.   The enterprise is engaged in, and its activities affect, interstate commerce. The Defendants' leadership is based in Atlanta, Georgia, Denver, Colorado, Chattanooga, Tennessee, and other locations as addressed in preceding paragraphs. Defendants' enterprise operates throughout the United States, as well as in Puerto Rico and the Philippines. Additionally, Defendant Big Picture Loans claims to do business on Tribal lands.

128.   The Defendants work together as an ongoing organization whose members function as a continuing unit for a common purpose of achieving the enterprise's objectives, namely the enrichment of the Defendants through the advancement and collection of unlawful, usurious loans to desperate, unsophisticated borrowers.

129.   As alleged above, Defendants, along with other participants not yet known to Plaintiff, violated § 1962(c) of RICO through the "collection of unlawful debt." 18 U.S.C. § 1962(c).

130.   RICO defines "unlawful debt" as a debt which was incurred in connection with "the business of lending money or a thing of value at a rate usurious

under State or Federal law, where the usurious rate is at least twice the enforceable rate." 18 U.S.C. § 1961(6).

131.   The means and methods by which the Defendants and other members and associates conducted and participated in the conduct of the affairs of the enterprise was and continues to be the operation, direction, and control of the payday loan company in the business of lending money at usurious rates under the laws of numerous states, including California, where the usurious rates charged were at least twice the enforceable rate. Defendants were directly and materially involved in this intentional misconduct. They knew the subject loans were illegal under California law, but they actively participated in the solicitation of borrowers and the illegal lending enterprise anyway.

132.   All of the loans made and collected by Defendants included an interest rate far in excess of twice the enforceable rate.

133.   In operating and conducting the affairs of the enterprise, the Defendants used proceeds from the collection of unlawful debt to further the operations and objectives of the enterprise.

134.   The predicate acts of collection of unlawful debt are described herein and in particular in paragraphs 27-37 and 60-98 herein. The debts incurred by Plaintiff and all other members of the National RICO Class are unlawful and unenforceable.

135.   The Defendants' leadership, management, and participation in the enterprise began at some point as early as 2011, following the formation of Red Rock Tribal Lending, LLC, continued with the formation of Defendant Big Picture Loans in 2016, continues to date, and will occur repeatedly in the future to the detriment of consumers.

136.   Plaintiff and the National RICO Class members were injured as a result of Defendants' violations of 18 U.S.C. § 1962(c). In particular, Plaintiff and the

National RICO Class have been deceived, coerced, and harassed to pay extortionate and usurious interest, as well as the principal, on unlawful debts. Accordingly, as a direct and proximate cause of their violations of RICO, Defendants are jointly and severally liable to Plaintiff and the putative members of the National RICO Class for their actual damages, treble damages, costs, and attorneys' fees pursuant to 18 U.S.C. § 1964(c).

## COUNT FIVE – VIOLATIONS OF RICO, 18 U.S.C. § 1962(D)
### NATIONAL RICO CLASS

137. Plaintiff incorporates each of the allegations in the preceding paragraphs as if set forth here.

138. Beginning as early as 2011, Defendants, as persons employed by and associated with the aforementioned payday lending enterprise, along with other participants not yet known to Plaintiff, violated 18 U.S.C. § 1962(d) by willfully and knowingly conspiring and entering into a series of agreements to violate § 1962(c) and usury laws nationwide-that is, to conduct and participate, directly and indirectly, in the collection of unlawful debt. In addition, Defendants knowingly entered into agreements to facilitate the development and management of the enterprise and engaged in overt acts to further the business interests of the enterprise.

139. Defendants, along with other participants not yet known to Plaintiff, violated § 1962(d) of RICO by entering into a series of agreements to violate 18 U.S.C. § 1962(c). These agreements, include, *inter alia*: (a) agreements between and among Defendants, including their predecessors in interest, Red Rock Tribal Lending, LLC and Bellicose Capital, to create the necessary legal frameworks and entities to conduct the affairs of the lending enterprise; (b) agreements between and among Defendants to provide the necessary funds to conduct and expand the affairs of the lending enterprise; (c) agreements between and among Defendants to investigate and solicit investors in furtherance of the affairs of the lending enterprise;

(d) agreements between and among Defendants to generate high-interest loans to desperate borrowers, including residents of California; (e) agreements between and among Defendants to refinance the lending enterprise, including the agreement for the acquisition of Bellicose Capital and the continued payments to Martorello; and (f) agreements between and among the Defendants and unknown third parties to further conduct the affairs of the Defendants' lending enterprise.

140.   Each of the agreements identified in the preceding paragraph contemplated that a conspirator would commit at least one collection of unlawful debt in the conduct and furtherance of the affairs of the enterprise.

141.   As a result of Defendants' participation in the enterprise and violations of RICO, Defendants are jointly and severally liable to Plaintiff and the National RICO Class members for their actual damages, treble damages, costs, and attorneys' fees pursuant to 18 U.S.C. § 1964(c).

## COUNT SIX – VIOLATIONS OF RICO, 18 U.S.C. § 1962(C)
### CALIFORNIA RICO SUBCLASS

142.   Plaintiff incorporates each of the allegations in the preceding paragraphs as if restated here.

143.   At all relevant times, Big Picture Loans, LLC, Ascension Technologies, LLC f/k/a Bellicose Capital, LLC, and Matt Martorello were members and associates of an internet payday lending enterprise, whose members and associates engaged in the collection of unlawful debt.

144.   The Defendants, including their leadership, membership, and associates, constitute an "enterprise" as that term is defined in 18 U.S.C. § 1961(4) - that is, a group of individuals and entities associated in fact.

145.   The enterprise is engaged in, and its activities affect, interstate commerce. The Defendants' leadership is based in Atlanta, Georgia, Denver, Colorado, Chattanooga, Tennessee, and other locations as addressed in preceding

paragraphs. Defendants' enterprise operates throughout the United States, including the Central District of California, as well as in Puerto Rico and the Philippines. Additionally, Defendant Big Picture Loans claims to do business on Tribal lands.

146.   The Defendants work together as an ongoing organization whose members function as a continuing unit for a common purpose of achieving the enterprise's objectives, namely the enrichment of the Defendants through the advancement and collection of unlawful, usurious loans to desperate, unsophisticated borrowers.

147.   As alleged above, Defendants, along with other participants not yet known to Plaintiff, violated § 1962(c) of RICO through the "collection of unlawful debt." 18 U.S.C. § 1962(c).

148.   RICO defines "unlawful debt" as a debt which was incurred in connection with "the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate." 18 U.S.C. § 1961(6).

149.   The means and methods by which the Defendants and other members and associates conducted and participated in the conduct of the affairs of the enterprise was and continues to be the operation, direction, and control of the payday loan company in the business of lending money at usurious rates under the laws of numerous states, including California, where the usurious rates charged were at least twice the enforceable rate. Defendants were directly and materially involved in this intentional misconduct. They knew the subject loans were illegal under California law, but they actively participated in the solicitation of borrowers and the illegal lending enterprise anyway.

150.   All of the loans made to California residents and collected by Defendants included an interest rate far in excess of twice the enforceable rate in California.

151.   In operating and conducting the affairs of the enterprise, the Defendants used proceeds from the collection of unlawful debt to further the operations and objectives of the enterprise.

152.   The predicate acts of collection of unlawful debt are described herein and in particular in paragraphs 27-37 and 60-98 herein. The debts incurred by Plaintiff and all other members of the California RICO Subclass are unlawful and unenforceable.

153.   The Defendants' leadership, management, and participation in the enterprise began at some point as early as 2011, following the formation of Red Rock Tribal Lending, LLC, continued with the formation of Defendant Big Picture Loans in 2016, continues to date, and will occur repeatedly in the future to the detriment of California consumers.

154.   Plaintiff and the California RICO Subclass members were injured as a result of Defendants' violations of 18 U.S.C. § 1962(c). In particular, Plaintiff and the California RICO Subclass have been deceived, coerced, and harassed to pay extortionate and usurious interest, as well as the principal, on unlawful debts. Accordingly, as a direct and proximate cause of their violations of RICO, Defendants are jointly and severally liable to Plaintiff and the putative members of the California RICO Subclass for their actual damages, treble damages, costs, and attorneys' fees pursuant to 18 U.S.C. § 1964(c).

## COUNT SEVEN – VIOLATIONS OF RICO, 18 U.S.C. § 1962(D)
### CALIFORNIA RICO SUBCLASS

155.   Plaintiff incorporates each of the allegations in the preceding paragraphs as if set forth here.

156.   Beginning as early as 2011, Defendants, as persons employed by and associated with the aforementioned payday lending enterprise, along with other participants not yet known to Plaintiff, violated 18 U.S.C. § 1962(d) by willfully and

knowingly conspiring and entering into a series of agreements to violate § 1962(c) and California's usury laws-that is, to conduct and participate, directly and indirectly, in the collection of unlawful debt. In addition, Defendants knowingly entered into agreements to facilitate the development and management of the enterprise and engaged in overt acts to further the business interests of the enterprise.

157.   Defendants, along with other participants not yet known to Plaintiff, violated § 1962(d) of RICO by entering into a series of agreements to violate 18 U.S.C. § 1962(c). These agreements, include, *inter alia*: (a) agreements between and among Defendants, including their predecessors in interest, Red Rock Tribal Lending, LLC and Bellicose Capital, to create the necessary legal frameworks and entities to conduct the affairs of the lending enterprise; (b) agreements between and among Defendants to provide the necessary funds to conduct and expand the affairs of the lending enterprise; (c) agreements between and among Defendants to investigate and solicit investors in furtherance of the affairs of the lending enterprise; (d) agreements between and among Defendants to generate high-interest loans to desperate borrowers, including residents of California; (e) agreements between and among Defendants to refinance the lending enterprise, including the agreement for the acquisition of Bellicose Capital and the continued payments to Martorello; and (f) agreements between and among the Defendants and unknown third parties to further conduct the affairs of the Defendants' lending enterprise.

158.   Each of the agreements identified in the preceding paragraph contemplated that a conspirator would commit at least one collection of unlawful debt in the conduct and furtherance of the affairs of the enterprise.

159.   As a result of Defendants' participation in the enterprise and violations of RICO, Defendants are jointly and severally liable to Plaintiff and the California RICO Subclass members for their actual damages, treble damages, costs, and attorneys' fees pursuant to 18 U.S.C. § 1964(c).

## COUNT EIGHT – UNJUST ENRICHMENT

160.   Plaintiff incorporates each of the allegations in the preceding paragraphs as if restated here.

161.   The loans made by Defendants to Plaintiff and the Class members were void and illegal.

162.   Plaintiff and the Class members conferred a benefit on Defendants when they repaid principal and interest on the void and usurious loans;

163.   Defendants knew of the benefit; and Defendants have been unjustly enriched through their receipt of any amounts in connection with the unlawful loans.

164.   The equitable doctrine against unjust enrichment also applies in this context because of the importance of the public policies against usury, because the refusal to enforce the terms of the loans would further the public policies, because of the gravity of the misconduct at issue, because of the materiality of the interest rate provisions to the rest of the loan agreement, and because of the impact of the remedy on the parties' rights and duties.

165.   Accordingly, Plaintiff seeks to recover from Defendants, jointly and severally, all principal and interest repaid on Defendants' loans by Plaintiff and the Class members. In the alternative, Plaintiff seeks to recover from Defendants, jointly and severally, all interest paid on Defendants' loans by Plaintiff and the Class that exceed the maximum legal rate of 12% interest that may be charged on the subject consumer loans.

## VII.  PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that the Court enter judgment on behalf of himself and the Class he seeks to represent against Defendants for:

(a)    Certification for this matter to proceed as a class action;

(b)    Declaratory relief, injunctive relief, actual damages, statutory damages, treble damages, and punitive damages, as pled herein;

(c)     Attorney's fees and costs of suit; and

(d)     Such other and further relief as the Court deems proper.

## VIII.  DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all claims so triable.

This 12th day of April, 2019.

Dated: April 12, 2019                  Respectfully submitted,

By: */s/ Michael A. Caddell*
        Michael A. Caddell (SBN 249469)
        mac@caddellchapman.com
        Cynthia B. Chapman (SBN 164471)
        cbc@caddellchapman.com
        Amy E. Tabor (SBN 297660)
        aet@caddellchapman.com
        John B. Scofield, Jr. (*pro hac vice forthcoming*)
        CADDELL & CHAPMAN
        628 East 9th Street
        Houston TX 77007-1722
        Tel.: (713) 751-0400
        Fax: (713) 751-0906

        *Attorneys for Plaintiff*